**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0013n.06
Filed: January 6, 2005

Nos. 02-5781/6292/6322

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Norman T. Sexton, James A. Legg, and | ) | EASTERN DISTRICT OF TENNESSEE |
| Richard Romans, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

**BEFORE:** Merritt, Moore, and Gilman, Circuit Judges.

**MERRITT, Circuit Judge.** Defendants Norman T. Sexton, James A. Legg, and Richard Romans challenge, on a wide variety of grounds, their convictions and sentences following a 23-day trial. All three defendants were convicted of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1); defendants Legg and Romans were also convicted under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) on individual counts of distribution of cocaine. We will review the assignments of error on appeal in the following order: (1) claimed erroneous rulings on evidentiary issues; (2) erroneous ruling on a motion to suppress claimed by Legg; (3) improper contact with jurors claimed by Sexton; (4) insufficiency of the evidence claimed by Sexton; (5) claims of faulty jury instructions made by Romans and Sexton; (6) prosecutorial misconduct claimed by Sexton; (7) ineffective assistance of counsel claimed by Sexton and (8) errors in sentencing.

For the following reasons, we affirm the judgment of the district court.

## I. Background

Defendants Roman and Legg lived on a large tract of rural land in East Tennessee owned by Legg. Several cabins on the property served as the personal residences of Legg, Romans, coconspirator Sarah Moss and several others involved in the conspiracy. Defendant Sexton lived nearby and owned a local bar named "The Rhode House." The cabins on Legg's property and the Rhode House bar served as primary locations from which most of the drug dealing of the conspiracy was conducted. The conspiracy involved a large number of individuals over a four-to-five-year period. Sexton was the primary supplier of cocaine to Legg and Romans, although Sexton himself did not generally sell drugs to customers directly. Defendants Legg and Romans sold drugs and supplied drugs to others for resale.

Police started surveillance and undercover operations of the conspiracy in 1995. Confidential informants, as well as undercover officers, were used to purchase cocaine from Legg and Romans on several occasions. Defendants were arrested in 1999 and stood trial together in late 2000. Coconspirator Sarah Moss was also named in the indictment with these three defendants, but she pled guilty and did not stand trial. We will incorporate the relevant facts into our review of individual issues.

## II. Evidentiary Issues

The trial lasted 23 days. At trial, 47 witnesses were called to testify, including indicted and unindicted coconspirators and various law enforcement officers. The government also used tape

recordings of controlled cocaine buys to present evidence proving the existence of a conspiracy involving defendants.

### A. <u>Admission of Testimony of Coconspirators</u>

The district court admitted at trial the testimony of several indicted and unindicted coconspirators, including Robert Thompson, Tony Phillips, Elizabeth Sexton, Roger Pilgrim, Eugene Jones, Darlene Estill and Karen Slutton, ruling that the statements were made during and in furtherance of the conspiracy and are therefore exceptions to the hearsay rules. Fed. R. Evid. 801(d)(2)(E) (admitting statements if the "statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy"). The trial court may conditionally admit coconspirator statements, as it did here, subject to subsequent demonstration of their admissibility. Fed. R. Evid. 104(b); *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979). For such statements to be conditionally admitted, the government must show by a preponderance of the evidence that (1) the conspiracy existed, (2) the defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *United States v. Smith*, 320 F.3d 647, 654 (6th Cir. 2003).[1]

---

[1]A 1997 amendment to Rule 801(d)(2)(E) codifies the holding in *Bourjaily* by stating expressly that a court shall consider the contents of a coconspirator's statement in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." According to *Bourjaily*, Rule 104(a) necessitates these preliminary requirements to be established by a preponderance of the evidence. Second, the amendment provides that the contents of the declarant's statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated. The court must consider in addition the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was

Defendants argue both that the government failed to show that a conspiracy existed and that statements were made "in furtherance" of the conspiracy. We disagree. In addition to the statements of the coconspirators themselves, the district court heard extensive other evidence from law enforcement and other witnesses indicating the existence of a conspiracy. The district court therefore conditionally admitted the statements and then made extensive findings later to support their admission. (J.A. at 3392-3407, 3466-86)

The evidence of a conspiracy relied upon by the district court to conditionally admit the statements includes Officer Bryant's undercover activities and controlled buys from Legg, recorded conversations between and among informants, coconspirators and Legg and Romans, observations by officers of meetings between and among coconspirators during and after drug transactions and the actual seizure of drugs on Legg's property. For example, the court cited the testimony of Darlene Estill, who was Legg's girlfriend and lived with him off and on for four years, including during the existence of the conspiracy. She was involved in Legg's drug activities and testified that he supplied cocaine to Romans and Sarah Moss. Estill testified that Legg told her that defendant Tim Sexton was Legg's supplier. While she lived with Legg she knew of more than a dozen customers of Legg's, including Romans and Moss, who then resold cocaine to others. She testified

---

made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question. *See United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir. 1994). The statements may be admitted subject to a later ruling that the government has met its burden. *Id.* The district court may rely on a coconspirator's statement to determine whether a conspiracy has been established as long as there is some independent corroborating evidence that serves to rebut the presumption of unreliability of out-of-court statements. *Id.*

that Legg would take money from drug transactions to Sexton's house and would sometimes return from those visits with more drugs to sell. Estill recorded a conversation with Sarah Moss that indicated that Sexton sometimes provided drugs to Romans, Legg and Moss for resale and Moss joked about competition between Romans and her for cocaine customers. The court cited numerous other items of testimony to indicate that Legg, Romans, Sexton and Moss, along with others, engaged in a drug conspiracy during the time in question. Trial Trans. at 3060-66, J.A. at 3395-3401.

In addition to challenging the existence of a conspiracy, defendants also challenge whether the admitted coconspirator statements were made "in furtherance of the conspiracy." A statement is "in furtherance" of a conspiracy if it is intended to promote the objectives of the conspiracy – here to sell cocaine. *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). Many of the admitted statements were made by coconspirators during the course of an actual drug transaction. Some of the statements informed other conspiracy members or customers about the source of the cocaine, and the hierarchy or the roles of various persons in the conspiracy. Trial Trans. at 3070-72; J.A. at 3405-07.

Defendants further contend that the court is required to review each offering by the government separately to determine if a particular statement is one in furtherance of the conspiracy. Before making a determination as to whether the statement was admissible under Rule 801(d)(2)(E), the court reviewed each conversation in colloquy with counsel. The district court reviewed the specific evidence particular to each coconspirator to establish the existence of a conspiracy and that person's role in the conspiracy before admitting the statement made by that person. The court

correctly found that the statements were made in furtherance of the conspiracy. Accordingly, there was no error in admitting the coconspirator statements.

### B. Tape Recordings Made by Informant Eddie Goins

Tapes were made by confidential informant Eddie Goins during several controlled buys from coconspirator Sarah Moss and defendant Romans. Under police supervision, the conversations were transmitted in real time with a hidden transmitter. This method allowed police to monitor Goins simultaneously as he spoke. It also allowed a recording to be made with a body recorder. The recordings were later reviewed and transcribed. In addition to implicating Romans, from whom Goins made two buys, the taped conversations implicate Sexton and Legg in the conspiracy. Most of the tapes, along with accompanying transcripts, were admitted into evidence over the objections of defendants, but Goins did not testify for the government when it was discovered that he lied to police and fabricated two tape-recorded conversations relating to the investigation. Goins was not named as a coconspirator. The government introduced the tapes through the participating police officers and questioned the officers about the circumstances surrounding the tape recordings. Defendants called Goins as a witness, but he refused to testify, asserting his Fifth Amendment privilege.

Defendants challenge the court's admission of the tapes on the following grounds: (1) that Goins' testimony was necessary to introduce the tapes into evidence and to allow them to cross-examine and impeach Goins; (2) the tapes were not properly authenticated and the voices on the tapes were not properly identified; (3) the tapes were inadmissible without the admission of the two

fabricated Goins tapes; (4) the admission of the tapes violated their Sixth Amendment confrontation rights because Goins was not available for cross-examination.

### 1. <u>Authentication and Voice Identification under the Federal Rules of Evidence</u>

Rule 901(a) provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule also states, by way of illustration, that the testimony of a witness that the item is what it purports to be is sufficient authentication under the rule. Fed. R. Evid. 901(b)(1). The admission of the tapes satisfied Rule 901. Law enforcement officers present during the tapings testified in detail about the procedures used when Goins was outfitted with the transmitter and recorder during the controlled buys. The fact that Goins did not testify to authenticate the tape recordings or identify the other voices does not render them inadmissible. It is not necessary for a participant of the conversation to testify to the authenticity of the recordings so long as other indicia of accuracy and reliability are established. Goins wore a transmitter and a body recording device, which recorded a second contemporaneous tape of the conversation. The recording devices were removed from Goins immediately after the conversations occurred, and the transmitter recordings were compared with the body recorder tapes to ensure that they were duplicates of the same conversations. Police witnesses adequately testified as to these procedures. This testimony is therefore sufficient under Rule 901. *United States v. Batts*, No. 91-5096, 1991 WL 230023, **2 (6th Cir. Nov. 7, 1991). Romans fails to point to anything in the record that would create a question as to the authenticity of this tape recording.

Romans also argues that the voices on the tape recording of Goins' conversations with coconspirators have not been properly identified. Federal Rule of Evidence 901(b)(5) provides that a witness may identify or authenticate the voice or speaker on a tape if he has heard "the voice at any time under circumstances connecting it [the voice] with the alleged speaker." Various witnesses, who heard the recorded conversations and were familiar with the voices therein, testified as to the identity of the speakers recorded on the tape, in conformance with Federal Rule 901. Although the defense disputed some of the identifications, there was sufficient proof of identity to admit the tapes. In sum, the government adequately demonstrated through testimony by the police who were monitoring the controlled buys and testimony of persons familiar with Goins' and Moss' voices that the tapes were in fact what they claimed to be, even without Goins' testimony. It was not error to admit the tapes.

## 2. **Hearsay Rules and the Confrontation Clause**

The district court did not admit Goins' statements on the tape under Rule 801(d)(2)(E), the coconspirator exception to the hearsay rule. The court admitted the Moss and Roman portions of the conversations pursuant to Federal Rule of Evidence 801(d)(2)(A) as an admission of a party opponent, and Goins' statements were admitted because they were not offered for their truth, but rather to give meaning to the admissible responses of Romans and Moss. Goins' statements were not hearsay because they were not "offered into evidence to prove the truth of the matter asserted," under Federal Rule of Evidence 801(c). Their admission does not violate the hearsay rule. *See United States v. McDonald*, Nos. 97- 5339/5556/5338/5187/5196, 1999 WL 149658, at *9 (6th Cir. March 1,1999) (collecting cases); *United States v. Johnson*, 71 F.3d 539, 543 (6th Cir.1995); *United*

*States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990). The district court properly instructed the jury that Goins' statements on the tape could not be used as evidence.

Romans and Sexton further erroneously contend that the admission of Goins' tape-recorded statement violated their Sixth Amendment right to confront the witnesses against them. When an out-of-court statement is not offered to prove the truth of the matter asserted, as with Goins' statements, the Confrontation Clause is not implicated. *Tennessee v. Street*, 471 U.S. 409, 413 (1985); *United States v. Martin*, 897 at 1372.

The statements were clearly admissible under the Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (Mar. 8, 2004). Because Goins' statements were not offered for their truth, they are not hearsay, and the other statements fall within well-established exceptions to the hearsay rule – either as admissions or statements of coconspirators.

### 3. <u>Error to Allow Use of Transcript</u>

Romans asserts that the court erred when it permitted the jury to use transcripts as an aid while listening to the tape recordings of Goins and various coconspirators. Police witnesses testified that they had listened to the tapes and that the transcripts accurately reflected the content of the conversations and the identity of the speakers. *See* Fed. R. Evid. 901(a) ("The general requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *United States v. Robinson*, 707 F.2d 872, 877 (6th Cir.1983). The district judge also listened to the recordings and compared them with the transcripts. He concluded that the transcript was accurate and instructed the jury to use the transcript as an aid rather than as evidence. Moreover, Romans did not

specifically identify for the court any place where the transcript and the tape did not match. We find no error.

### 4. Exclusion of the Two Fabricated Tape Recordings

Defendant Romans also contends that the district court erred in excluding the two fabricated tape recordings made by informant Eddie Goins because they would have demonstrated Goins' lack of trustworthiness and impeached his credibility pertaining to the tapes of the controlled buys that were admitted. Romans asserts both error in the evidentiary ruling excluding the tapes, as well as Confrontation Clause problems arising from the lack of opportunity to cross-examine and impeach Goins on the fabricated tapes.

The government stipulated to the fabrication, and the jury was told of the stipulation and fabrication. The jury was well aware of the existence of the fabricated tapes. Defense counsel reminded the jury on numerous occasions throughout the trial proceedings about Goins' deception, driving home the point of his untrustworthiness. We fail to see how the failure to allow the playing of fabricated tapes could have affected the outcome of the trial or prejudiced the defendants.

### C.. Cross-Examination and Impeachment of Witnesses

Defendant Sexton challenges a large number of evidentiary rulings concerning cross-examination of defense and government witnesses. First, Sexton argues that the district court impermissibly limited the scope of cross-examination of government witnesses by Sexton's counsel, particularly those serving as informants or coconspirators who provided testimony in exchange for more favorable sentences, grants of immunity, or, in the case of Eddie Goins, received payment for his informant role. Sexton claims that he was not allowed to expose the "quid pro quos" and

inconsistent statements of various witnesses, nor was he able to cross-examine Sally Moss or Eddie Goins at all.

A balance must be struck between permitting a trial court to exercise its sound discretion and affording a criminal defendant the opportunity to expose bias and prejudice. Clearly, cross-examination concerning the partiality of a witness is always relevant. *United States v. Touchstone*, 726 F.2d 1116, 1122 (6th Cir.1984). Therefore, a trial court may not prevent a criminal defendant from exploring a witness' bias, prejudice, or motive for testifying, or curtail cross-examination concerning whether testimony is given with the expectation of immunity or out of fear or coercion.

In determining whether a trial court erred in allowing only limited cross-examination as to motive, bias, or prejudice, a reviewing court must decide "whether the jury was otherwise in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias." *Touchstone*, 726 F.2d at 1123 (quoting *United States v. Campbell*, 426 F.2d 547, 550 (2d Cir.1970)); *United States v. Baker*, 494 F.2d 1262, 1267 (6th Cir.1974). When a cross-examiner is not permitted reasonable latitude to develop facts that tend to demonstrate that the testimony in chief is biased and sufficient independent evidence of bias is not available to the jury, the trial court has abused its discretion.

The district court allowed some cross-examination of all the witnesses that testified. In those circumstances where the trial judge did restrict cross-examination, it was generally because it was going beyond the scope of the direct, or was redundant. As for the Goins tapes that were admitted without the testimony of the declarant, Eddie Goins, Sexton was provided ample opportunity to

cross-examine the officers that testified about the procedures used when the tapes were made. In addition, other witnesses who authenticated the Goins' tapes and identified the voices on the tapes were available for cross-examination.

With regard to Elizabeth Sexton, Tim Sexton's cousin, defense counsel objected when the court relied on Federal Rule of Evidence 608(b) to prevent the defense from putting on extrinsic evidence in an attempt to impeach her on collateral matters; namely her alleged bias against Sexton for evicting her from the family home. Defense counsel attempted to put on extrinsic evidence to show that Elizabeth Sexton had made prior statements inconsistent with her court testimony. Rule 608(b) provides, "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence." The court found that the prior statement was not inconsistent and that defense counsel wished to use it only for the purposes of impeachment, in violation of Rule 608(b). Defense counsel was able to cross-examine Elizabeth Sexton, as well as other witnesses with knowledge about the incident, including any bias by Elizabeth against Sexton for evicting her from their home.

Sexton contends that certain defense witnesses were improperly cross-examined by the government. One witness was asked about his invocation of the Fifth Amendment before the grand jury, thus implying to the trial jury that the witness had something to hide; but the issue about which the witness invoked the Fifth Amendment before the grand jury was not relevant to the drug conspiracy at issue in the trial. Even if it was error, it was unlikely to have caused any prejudice to Sexton. Another defense witness was questioned about the federal prosecution of several family

members to show bias. No details of the offenses were placed before the jury. The government also attempted to impeach the character of the business manager at Sexton's Rhode House bar when she was questioned about her failure to keep tax and other records documenting the business, the presence of illegal gambling machines in the bar and the fact that employees of the Rhode House were paid in cash. These were proper areas of questioning to impeach the business manager's testimony that she and Sexton were operating a legitimate business.

Finally, Sexton challenges the impeachment of his character witnesses, the fact that he was limited to introducing three character witnesses and the district court's refusal to give the jury instruction he requested concerning character witnesses. The character witnesses testified as to Sexton's reputation as a law-abiding citizen. The government cross-examined these witnesses about Sexton's friendship with known cocaine dealers and users, which Sexton challenged as "guilt by association." The questioning was permissible impeachment testimony to counter the testimony that Sexton was a law-abiding citizen. As to the number of character witnesses and the jury instruction, the court has discretion to limit the number of character witnesses, particularly where there are no extraordinary circumstances, such as here. The three witnesses testified as to Sexton's law-abiding reputation in the community and the fact that he was a law-abiding citizen. Further witnesses testifying to these matters would have been redundant. Sexton requested that the court instruct the jury that "proof of good character, standing alone, is sufficient to generate reasonable doubt" as to defendant's guilt. The court refused to give this instruction and instead gave the pattern jury instruction regarding character witnesses. This was not error.

### D. <u>Chain of Custody of Drug Evidence</u>

Romans also contests the admission of the cocaine obtained through the controlled buys with Goins, arguing that the government failed to establish a proper chain of custody. Physical evidence is admissible when the possibility of misidentification or alteration is "eliminated, not absolutely, but as a matter of reasonable probability." *See United States v. Allen*, 106 F.3d 695, 700 (6th Cir.1997) (citations omitted)*; United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972). Merely raising the possibility of tampering or misidentification, without more, is insufficient to render evidence inadmissible. *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir.1994). Furthermore, "challenges to the chain of custody go to the weight of the evidence, not its admissibility." *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir.1990); *see also United States. v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004). Given the consistent testimony of witnesses with knowledge about the events, the district court did not err where ample evidence supported a finding that the cocaine was obtained in the manner described by the government. Romans merely raises the unsupported claim that someone may have tampered with the evidence; he points to no evidence supporting such a claim. The challenge to the authenticity of the drugs seized during the controlled buys is pure conjecture, based on nothing more than the fact that Goins fabricated two tapes.

### E. <u>Sarah (aka Sally) Moss Guilty Plea</u>

Sarah Moss was an original codefendant who pleaded guilty prior to trial. The government then called her to testify after requesting immunity for her pursuant to 18 U.S.C. § 6002. The district court called Moss to the stand outside the presence of the jury and confirmed that she

intended to invoke her Fifth Amendment privilege. The court informed Moss it would grant the request for immunity and told her that she was compelled to testify.

Once on the witness stand, Moss admitted to pleading guilty to the conspiracy but denied she had engaged in any drug trafficking with defendants and testified that she did not know anything about their involvement in a conspiracy. After being pressed by the government on direct examination, she acknowledged the existence of her recorded statements purporting to sell cocaine to Eddie Goins. She eventually refused to testify further. Because the court had granted the request for immunity, it informed Moss she could no longer rely on her Fifth Amendment privilege to refuse to answer questions and ordered her to testify. After she continued to refuse to testify, the court cited her for civil contempt and incarcerated her.

The government attempted to impeach Moss by entering her guilty plea into evidence, which established Moss' involvement with the conspiracy. Generally, the guilty plea or conviction of a codefendant or coconspirator is not admissible at trial, and such guilty pleas and convictions are never admissible as substantive evidence of another defendant's guilt. *United States v. Blandford*, 33 F.3d 685, 709 (6th Cir.1994). Evidence that a coconspirator has been convicted of conspiring with a criminal defendant is generally inadmissible because it might lead the jury to "regard the issue of the remaining defendant's guilt as settled and [conclude that] the trial is a mere formality." *United States v. Modena*, 302 F.3d 626, 631 (6th Cir. 2002); *United States v. Griffin*, 778 F.2d 707, 711 (11th Cir.1985); Fed. R. Evid. 403 (providing that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

Nevertheless, guilty pleas and convictions may be introduced into evidence if the coconspirator or codefendant testifies at trial, so that the factfinder will have appropriate facts to assess the witness' credibility. When a guilty plea or conviction is introduced into evidence, the district court is required to give a cautionary instruction to the effect that the jury may use the conviction or guilty plea only to determine the testifying witness' credibility.

To address this turn of events, the court prepared, *sua sponte*, a jury instruction based on the Sixth Circuit Pattern Jury Instructions § 7.08:

> You have heard the testimony of Sarah Moss. You have also heard that this individual was indicted for the same crime that the Defendants are charged with committing. You should consider the testimony of this witness with more caution than the testimony of other witnesses.
>
> Do not convict the Defendants based on the unsupported testimony of such a witness, standing alone, unless you believe her testimony beyond a reasonable doubt.
>
> You are also instructed that the fact that Sarah Moss has pleaded guilty to a crime is not evidence that the Defendants are guilty, and you cannot consider this against the Defendants in any way.

Defense counsel objected to this instruction. Moss persisted in her refusal to testify, even after the judge brought her back to the courtroom before the close of the evidence. The judge indicated to counsel that he was inclined to strike her testimony; but because it was partially exculpatory to defendants, he would let defense counsel decide the issue. At defense counsels' request, the court struck all of Moss' testimony and instructed the jury to disregard it.

Where the court strikes evidence and instructs the jury to disregard it, the normal rule is that the error is cured unless the testimony is "so prejudicial that the jury could not be trusted to disregard it." *United States v. Stines*, 313 F.3d 912, 919 (6th Cir. 2002). Here, the testimony was

-16-

not "so prejudicial that the jury could not be trusted to disregard it." Moss' testimony was at least partially exculpatory. She claimed to have no knowledge of a conspiracy or of defendants' participation in one. The jury did know, however, that she pleaded guilty to a conspiracy with the defendants and defendants never had an opportunity to cross-examine her. Given the mixed nature of Moss' testimony, and the instruction by the court to disregard all of her testimony, any error was harmless.

### III.  Other Claimed Trial Errors

### A.  Legg's Motion to Suppress

Legg moved to suppress evidence seized during execution of a search warrant issued by a Tennessee state court magistrate judge. The items seized were narcotics, guns and money. The motion was denied, but the suppression hearing was reopened during the trial after it was determined that the officer who swore out the affidavit supporting the search warrant had lied about certain facts in the affidavit. Applying *Franks v. Delaware*, 438 U.S. 154 (1978),[2] the district court struck the false parts of the affidavit, but found that the remaining portions provided probable cause to believe evidence of drug trafficking would be found on Legg's property. The court also found that the "open fields" doctrine applied to the search, denying Legg any reasonable expectation of privacy in the evidence  hidden in the wooded area around his home.

---

[2] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that where defendant demonstrates perjury by a preponderance of the evidence, the false information must be set aside and if the remaining information is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded.

The warrant had been obtained the day before the search was executed based on an affidavit sworn to by Officer Cherilyn Bryant, an undercover officer with the Chattanooga Police Department. In her sworn affidavit, Bryant stated that she had purchased cocaine from Legg and a man named William Burnette, also known as "Computer," on numerous occasions and had observed others purchasing cocaine from Burnette. The property to be searched had several cabins and was identified as belonging to Legg.

The evidence seized included narcotics, guns and money from various locations around Legg's property. At issue in the suppression hearing was $4100 in cash and a coffee creamer jar wrapped in black electrical tape containing 6 ounces of cocaine found hidden in two separate places in a wooded area behind Legg's residence. A federal magistrate judge issued a report and recommendation in March 2000 recommending that the motion to suppress be denied. No objections were filed by either side at that time to the report and recommendation.

During the trial in November 2000, Officer Bryant admitted that she had fabricated part of her affidavit and that she had never purchased cocaine from Legg, and she had only witnessed one occasion of someone purchasing cocaine from Burnette. Based on this admission by Officer Bryant, Legg renewed his motion to suppress. The court found that Officer Bryant did fabricate parts of her affidavit and struck those parts of her affidavit. After striking those parts, the court found that sufficient probable cause remained to support issuance of the warrant in and around Legg's property. The court relied on those portions of the affidavit that stated that Officer Bryant had witnessed Legg preparing and consuming crack cocaine at his residence, directing an unknown person to purchase cocaine from Burnette and observing Burnette retrieving cocaine hidden in or

-18-

near the garage on the property. Legg has not disputed the veracity of these statements in the affidavit.

At the suppression hearing during the trial in November 2000, Officer Narramore, a member of the surveillance team, testified that he positioned himself on a ridge about 80-100 feet above the cabins. He saw Legg walk by him about 20 feet away on a logging road carrying a container wrapped in black tape, which he hid under a rock. He walked 20 more feet and placed another container under another rock. The officers investigated after Legg left and found the 6 ounces of cocaine in one container and the $4100 in the other.

The search warrant, even with the discredited portions removed in accordance with *Franks*, gave the officers ample probable cause to be on or near the property preparing to execute the search warrant. The officer then witnessed the suspicious behavior by Legg when he was hiding the two containers, giving him probable cause to investigate what Legg had hidden. The "plain view" doctrine authorizes the seizure of the items found. It is well settled that observations of "objects falling into the plain view of an officer who has a right to be in the position to have that view . . . may be introduced in evidence. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971); *Harris v. United States*, 390 U.S. 234, 236 (1968) (per curiam).

### B. Ex Parte Communication between Judge and Juror

Sexton contends that a brief ex parte communication concerning personal matters between the court and three jurors was error. When it became evident that the trial was going to take longer than anticipated, the court entertained requests by the jurors to be excused for personal reasons. Ultimately one juror was excused. "There is scarcely a lengthy trial in which one or more jurors do

not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Rushen v. Spain*, 464 U.S. 114, 118 (1983). The court told the parties he planned to hear from the jurors about personal hardships relating to the lengthy trial. No party objected, so we review for plain error and find none.

## C. Sufficiency of the Evidence

Defendant Sexton argues that the evidence is insufficient to convict him of conspiracy. We have held that:

> In determining whether the evidence supporting [the defendant's] conviction is sufficient, we must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In order for a criminal defendant to be found guilty of conspiracy under 21 U.S.C. § 846, the government must prove, beyond a reasonable doubt: (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator. *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir.1998).

Evidence from coconspirators, law enforcement, informants and the recorded controlled purchases demonstrate Sexton's role as the main supplier for the conspiracy. The evidence demonstrates that Sexton was the main supplier for Moss, Legg and Romans; other witnesses also stated that Sexton was their main supplier. At least five witnesses (Estill, Jones, Elizabeth Sexton, Thompson and Phillips) identified Sexton as their drug supplier. Robert Thompson testified that he

purchased cocaine directly from Sexton, but Sexton told him to purchase from someone else in the future. In tape recordings made between Sarah Moss and Eddie Goins during controlled buys Goins made from Moss, Moss identifies Sexton as her supplier. Law enforcement officials who monitored the controlled buys between Goins and Romans observed Romans meeting with Sexton immediately following drug sales by Romans. Drugs were frequently sold from Sexton's Rhode House bar, including the controlled buys. Viewing the evidence in a light most favorable to the government, there is no question that the government offered sufficient evidence during trial from which a reasonable jury could find Sexton to be guilty beyond a reasonable doubt of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846.

### D. <u>Jury Instructions</u>

Defendant Romans claims that the court failed to instruct the jury on his defense theory – a theory based solely on the fact that because Goins lied on two fabricated tapes, any evidence connected to him should be disregarded. No specific instruction was submitted on Romans' defense theory, but Romans did request a specific instruction that Goins had fabricated evidence and therefore all the tapes between Goins and Romans should be disregarded. The district court decision not to give this specific instruction was not error. The jury had been told about the fabricated tapes, and the defense had told them repeatedly that Goins was untrustworthy. A separate jury instruction about this untrustworthiness was not required.

### E. <u>Remaining Issues Concerning Sexton</u>

The remaining issues deal with Sexton's complaint that there was prosecutorial misconduct in connection with the cross-examination of his witnesses, both fact witnesses and character

witnesses, and that the judge was biased against his counsel and therefore "chilled" his defense, resulting in ineffective assistance of counsel. He also claims the court erred in limiting his character witnesses to three.

As to the prosecutorial misconduct in connection with the cross-examination of his witnesses, Sexton charges that the government made impermissible inquiries to these witnesses to establish "guilt by association." As discussed *supra*, the cross-examination was generally proper and any evidentiary error was harmless. To rise to the level of prosecutorial misconduct, Sexton must demonstrate intentional misconduct or reckless disregard for the truth by the prosecution in its cross-examination. Sexton presents no evidence that any errors during cross-examination rise to that level.

The "judicial bias" claim is meritless. This was a 23-day trial and the district court was called upon to make difficult rulings. A review of the testimony and rulings provide no evidence of bias against defendant Sexton or any other defendant.

## IV. Sentencing Issues

### A. Drug Quantities

The district court sentenced defendants under 21 U.S.C. § 841(b)(1)(C), which allows a maximum sentence of 240 months when more than five kilograms of cocaine are involved. Although the indictment did not specify the quantity of cocaine and the jury did not find any specific amount of cocaine attributable to the conspiracy, the trial court found that the conspiracy conviction involved 15.05 kilograms of cocaine. Sexton was sentenced to 238 months, Legg to 196 months and Romans to 148 months.

The defendants claim that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was violated by the district court when, in determining base offense levels under the Guidelines, it held the defendants responsible for a quantity of drugs not determined by the jury. The fact that the district judge computed the defendants' sentences under the Guidelines using a quantity of drugs not found by the jury is irrelevant under *Apprendi* so long as the resulting sentence is below the prescribed statutory maximum for the conviction. *See United States v. Solorio*, 337 F.3d 580, 596-97 (6th Cir.), *cert. denied*, 540 U.S. 1063 (2003); *United States v. Lawrence*, 308 F.3d 623, 634 (6th Cir. 2002) ("*Apprendi* by its terms applies only where the finding 'increases the penalty for a crime beyond the prescribed statutory maximum,' and we have squarely held that *Apprendi* does not apply to the Guidelines."); *United States v. Garcia*, 252 F.3d 838, 843 (6th Cir. 2001) ("*Apprendi* does not purport to apply to penalties in excess of any particular range or based on any particular offense level under the Sentencing Guidelines."). As the sentences did not exceed the standard range applicable to their convictions, these arguments are without merit.

Since the filing of the briefs in this case, however, the Supreme Court has held unconstitutional a sentencing scheme under which a state court imposed a sentence exceeding the statutory maximum on the basis of facts that were neither admitted by the petitioner nor found by a jury. *Blakely v. Washington*, --- U.S. ----, 124 S. Ct. 2531 (June 24, 2004); *see also United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 2004 WL 1713654 (Aug. 2, 2004), *oral argument held,* 2004 WL 2331491 (Oct. 4, 2004). Sexton filed a citation update with this Court requesting that the court vacate his sentence in light of *Blakely.* In *United States v. Koch*, 383 F.3d 436 (6th Cir. 2004), the Court decided *en banc* that *Blakely* does not apply to the federal sentencing

guidelines.  If the Supreme Court decides to the contrary in *Booker*, the defendants may file a petition for rehearing or for certiorari and renew their request.

### B. Role in the Offense

Sexton and Legg contend that their roles in the conspiracy did not warrant an enhancement pursuant to U.S.S.G. § 3B1.1(b).  U.S.S.G. § 3B1.1(b) calls for an increase in defendant's base offense level if he occupied a position of leadership or supervision.  The comment to § 3B1.1(b) lists relevant factors to be considered.

The evidence established that Sexton was the organizer or leader of a large group of people, including Legg, Romans and Moss.  Sexton dictated who would receive cocaine to sell and the price to be charged.  The evidence also clearly showed that Legg distributed cocaine through several individuals, including Randal Trevino, Herbie Payne, Darlene Estill, Sarah Moss and defendant Romans.  The conspiracy involved more than the five people necessary for an adjustment under the guideline.  The four-level enhancement for Sexton and the three-level enhancement for Legg were not error.

For the foregoing reasons, the judgment of the district court is affirmed.