**The STATE of Ohio, Appellee,**

**v.**

**SMITH, Appellant.**

[Cite as *State v. Smith,* 162 Ohio App.3d 208, 2005-Ohio-3579.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 85039.

Decided July 14, 2005.

210

William D. Mason, Cuyahoga County Prosecuting Attorney, and Deborah Naiman, Assistant Prosecuting Attorney, for appellee.

Britta M. Barthol, for appellant.

KARPINSKI, Presiding Judge.

{¶ 1} Defendant appeals his convictions by a jury (Count I) for possession of MDMA[1], a Schedule I drug, in violation of R.C. 2925.11[2], (Count II) sale of drugs in violation of R.C. 2925.03(A)(1), and (Count III) trafficking in a Schedule I drug in violation of R.C. 2925.03(A)(2). Both Counts II and III carried a "schoolyard" specification. Counts I, II, and III also carried one-year firearm specifications. Defendant was also convicted for possession of criminal tools[3] (Count IV), in violation of R.C. 2923.24. Defendant was sentenced to three years' imprisonment. By subsequent journal entry, the trial court additionally imposed community control sanctions. Defendant also appeals the imposition of those sanctions.

{¶ 2} On February 6, 2003, a Garfield Heights Police detective, James Mendolera, and a police informant[4] met in a school parking lot just before they executed a controlled drug buy. Detective Jeffrey Cook and another detective assisted

---

1. The popular street name for this drug is "ecstasy."

2. In an amount exceeding five times the bulk amount, but less than 50 times the bulk amount.

3. The criminal tools were specifically listed as a cell phone and/or a handgun, and a 1991 Honda automobile.

4. When he was arrested for a theft offense, informant volunteered defendant's name as someone who sold ecstasy. The informant also agreed to assist police with the February 6th controlled drug buy from defendant.

Mendolera in effectuating the buy. Cook was instructed to conduct surveillance on a house in the vicinity.

{¶ 3} On Mendolera's instruction, the informant called defendant and left a message. When defendant returned the call, he agreed to sell the informant 100 ecstasy pills for $1,050. The drug buy was to occur at a local gas station. These calls were recorded on a police audio tape. Before his meeting with defendant, the informant was outfitted with a wire transmitter to record the drug buy on the same police tape.

{¶ 4} The informant was dropped at the gas station. A gold Honda pulled into the station with driver Edmound Courtney[5] and defendant inside. After the informant entered the back seat of the vehicle, the conversations between the three men were monitored by police through the informant's wire.

{¶ 5} When the buy was completed, the informant, on Mendolera's instruction, verbally identified the ecstasy pills. As he counted the marked money out loud, he gave a verbal code signal to police. When Mendolera heard the signal, police approached the Honda, arrested Courtney and defendant, and recovered from the informant the marked money, along with the 100 ecstasy pills.

{¶ 6} Defendant proceeded to a jury trial in which Courtney testified against him in exchange for a reduced sentence. Following his convictions and sentencing, defendant filed this timely appeal in which he presents the following three assignments of error:

I. Appellant was improperly prohibited from challenging a witness in violation of his constitutional right to confront and cross-examine the witness against him.

{¶ 7} Defendant argues that the trial court erred by allowing the jury to hear the police tape. He argues that under the United States Supreme Court's recent decision in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the informant's taped statements are "testimonial" in nature and therefore should have been excluded by the trial court as inadmissible hearsay.[6] Further, because the informant did not testify at trial, defendant was denied his

---

5. Courtney was the owner of the house under surveillance and the owner of the Honda.

6. {¶ a} In Ohio, Evid.R. 801 defines "hearsay" as follows:
   {¶ b} (A) Statement.—A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
   {¶ c} (B) Declarant.—A "declarant" is a person who makes a statement.
   {¶ d} (C) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Sixth Amendment right to cross-examine and "challenge the informant's credibility."

**■** {¶ 8} As noted in *Crawford*, the Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." *Crawford*, 541 U.S. at 38, 124 S.Ct. 1354, 158 L.Ed.2d 177. The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed under a de novo standard. *United States v. Robinson* (C.A.6, 2004), 389 F.3d 582, 592.

{¶ 9} In *Crawford*, defendant's wife, exercising her marital privilege, did not testify at his trial. Before trial, however, in a tape-recorded statement to police, defendant's wife described the stabbing her husband was charged with. The statement conflicted with defendant's claim that the stabbing was in self-defense.[7] Defendant argued that the wife's statement not only was inadmissible hearsay, but violated his Sixth Amendment right of confrontation. The district court determined that the statement, though hearsay, was reliable and trustworthy, and the jury was allowed to hear it. Defendant was subsequently convicted.

{¶ 10} On appeal, the United States Supreme Court scrutinized the reliability of the wife's testimonial hearsay statement under the Confrontation Clause. The court described the myriad forms a testimonial statement might take. Testimonial statements may include the following:

"[E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

Id. at 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 11} The Supreme Court emphatically declared: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."

---

7. Defendant's wife told police that she led him to the victim's apartment. The prosecutor invoked the hearsay exception for statements against penal interest. See Wash.Evid.R. 804(b)(3), which is identical to Ohio's Evid.R. 804(b)(3).

Id. at 69, 124 S.Ct. 1354, 158 L.Ed.2d 177. The court determined that the wife's taped statement was testimonial and that its admission during defendant's trial violated his constitutional right to confrontation. Id. The court reversed defendant's conviction, but not before determining that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 at fn. 9

{¶ 12} Following *Crawford*, the case of *United States v. Sexton* (C.A.6, 2005), 119 Fed.Appx. 735, is factually identical to the case at bar. In *Sexton*, several defendants were arrested and charged with conspiracy to distribute cocaine. Prior to the arrests, police used confidential informants to conduct controlled drug buys from the defendants. Each of the drug transactions was audiotaped. One of the police informants, Eddie Goins, made several of the controlled buys from different defendants. As recounted in *Sexton:*

> Under police supervision, the conversations were transmitted in real time with a hidden transmitter. This method allowed police to monitor Goins simultaneously as he spoke. It also allowed a recording to be made with a body recorder. * * * Most of the tapes, along with accompanying transcripts, were admitted into evidence over the objections of defendants, but Goins did not testify for the government when it was discovered that he lied to police and fabricated two tape-recorded conversations relating to the investigation. Goins was not named as a coconspirator. The government introduced the tapes through the participating police officers and questioned the officers about the circumstances surrounding the tape recordings. Defendants called Goins as a witness, but he refused to testify, asserting his Fifth Amendment privilege.

Id. at 741. Each of the defendants was convicted.

{¶ 13} On appeal, the court determined that the taped statements were not hearsay because they were not offered to prove the truth of the matter asserted. The statements were used to "give meaning to the admissible responses of [defendants]."[8] Id. Further, Goins's statements did not violate the defendants' Sixth Amendment rights under the Confrontation Clause because they were not testimonial statements as described in *Crawford*, supra. The court explained:

> When an out-of-court statement is not offered to prove the truth of the matter asserted, as with Goins' statements, the Confrontation Clause is not implicated. * * * The statements were clearly admissible under the Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (Mar. 8, 2004).

---

8. Defendants' taped statements were admissible under Federal Evid.R. 801(d)(2)(A), admissions of a party-opponent.

*Sexton*, citing *Tennessee v. Street*, 471 U.S. 409, 413, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985); see, also, *United States v. Cromer* (C.A.6, 2004), 389 F.3d 662, 676.

{¶ 14} As in *Sexton*, the informant's taped statements in the case at bar were not offered for their truth, but simply to provide a context within which to understand defendant's otherwise admissible statements. In his description of the events leading up to defendant's arrest, Mendolera used the informant's statements at different points on the tape to explain the progression of the drug buy. He identified the "louder" voice as that of the informant and the "lower" voice as that of the defendant. After a segment of the tape was played, Mendolera was asked to describe the circumstances surrounding different portions of the tape.

{¶ 15} When the jury heard the informant verbally identify the pills and count the $1,050 in marked money, Mendolera confirmed that he and the informant had agreed on these verbal acts so that police could prepare to arrest the occupants of the car. Mendolera further explained that "looking good, looking good" was the signal for police to move in on the Honda.

{¶ 16} The informant's taped statements, therefore, are not hearsay under Evid.R. 801(C).[9] Because the informant's statements are not hearsay, moreover, they are not testimonial statements, and *Crawford* is not applicable. We conclude that the challenged statements do not violate the defendant's constitutional right to confrontation under the Sixth Amendment.·

{¶ 17} Accordingly, the trial court did not err in allowing the jury to hear the informant's taped statements. Defendant's first assignment of error is overruled.

II. Appellant's convictions were against the manifest weight of the evidence.

{¶ 18} Defendant argues that the state failed to produce evidence that he was in possession of any drugs when he was arrested. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982) 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

---

9. {¶ a} Evid.R. 801 specifies as follows:
    {¶ b} (D) Statements which are not hearsay. A statement is not hearsay if:
    {¶ c} * * *
    {¶ d} (2) Admission by party-opponent. The statement is offered against a party and is (a) his own statement, in either his individual or a representative capacity * * *.

{¶ 19} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, at ¶ 54, citing *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 20} In the case at bar, defendant was convicted of possessing the drug MDMA in violation of R.C. 2925.11. The statute defines the offense of possession of drugs and provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance." R.C. 2925.11(A).

{¶ 21} Persons act knowingly, regardless of their purpose, when they are aware that their conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A trial court must consider "all the attendant facts and circumstances in order to determine if a defendant knowingly possessed a controlled substance." *State v. Greene,* Cuyahoga App. No. 82948, 2004-Ohio-2008, 2004 WL 858749, at ¶ 16, citing *State v. Teamer* (1998), 82 Ohio St.3d 490, 492, 696 N.E.2d 1049.

{¶ 22} Possession is defined as having "control over a thing or substance." It may not be inferred, however, from a defendant's "mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "[P]ossession can be actual or constructive." *Greene,* 2004-Ohio-2008, 2004 WL 858749 at ¶ 18, citing *State v. Wolery* (1976), 46 Ohio St.2d 316, 329, 75 O.O.2d 366, 348 N.E.2d 351. "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson* (1982), 70 Ohio St.2d 87, 24 O.O.3d 155, 434 N.E.2d 1362, syllabus. When a defendant is in close proximity to drugs, "a rational trier of fact can conclude that it was within the appellant's dominion or control." *Green* at ¶ 18, citing *State v. Pruitt* (1984), 18 Ohio App.3d 50, 58, 18 OBR 163, 480 N.E.2d 499; *State v. Jenks* (1991), 61 Ohio St.3d 259, 272–73, 574 N.E.2d 492, (circumstantial evidence is sufficient to prove constructive possession).

{¶ 23} In the case at bar, defendant had possession of drugs. Mendolera and the informant met before the drug buy. From that point until the defendant's arrest, Mendolera continuously monitored the events and the informant.

Before the informant met with defendant, police made sure the informant had no drugs on him; he had only the marked drug money.

{¶ 24} Detective Cook maintained continuous visual contact with the motor vehicle in which defendant was a passenger when the drug buy was being executed. Cook had been assigned to conduct surveillance at Courtney's house before the informant was taken to the gas station. Cook was in contact with Mendolera through a cell phone and a police radio. Cook observed Courtney's gold Honda pull up to the house and then leave. He was not sure whether anyone got in or out of the car. When the car left, however, Cook identified two males as the occupants. Cook followed the vehicle to the gas station where the informant was waiting.

{¶ 25} The detectives continued their uninterrupted visual contact. When the informant was dropped at the station, Mendolera saw him move into the Honda's backseat. Both Mendolera and Cook identified two of the voices as that of the informant and the defendant. When Mendolera heard the code signal, the take-down order was given, and police arrested defendant and Courtney. The informant was in the back seat.

{¶ 26} Courtney described his own role in the drug transaction of February 6th:

Q: Now, I'm going to ask you to turn your attention to February 6th of 2003. Do you recall that day?

A: Yes.

Q: Relative to this case, what if anything happened prior to the arrest?

A: Could you be more specific?

Q: Okay. Did there come a time when you received a telephone call from Mr. Smith?

A: Yes.

Q: Explain about when that happened, where you were and the conversation.

 *  *  *

A: Yes, I was at home. I was in bed that day and Mr. Smith called me and he told me he needed a hundred rumpers is what we call them.

 *  *  *

Q: Is there, well, and when you talk about rumpers, what is it that you're referring to?

A: Ecstasy.

 *  *  *

Q:  *  *  * You received a call from Mr. Smith?

A:  I received a call from Mr. Smith.  He let me know that he needed a hundred rumpers, pills.  I told him to get the money together for it, and when he got the money together for it, he could come over to my house and get it.

Q:  Now how much would you charge him for 100 rumpers?

A:  It was either 900 or 950.  $950.

*  *  *

Q:  Describe for us the conversation that you had with Mr. Smith at your bedroom door.

A:  Well, he asked me, well, he told me he was ready and I asked him did he have the money.  He said no, so I told him I wasn't going to let him take the pills up there or wherever he needed to go because I didn't know who he was dealing with so I explained to him I would take him up there.

*  *  *

Q:  Describe for us the route, well, did you bring anything else with you?

A:  Yeah, before we left I got the hundred pills he needed.

*  *  *

Q:  I'm going to show you what's been marked for purposes of identification as State's Exhibit No. 6.  Would you please retrieve what's in that bag?

A:  (Indicating)

Q:  Do you recognize what those are?  Have you seen those before?

A:  Yes.

Q:  When was the last time you saw those?

A:  February 6th, 2003.

*  *  *

Q:  Now, all right, so you get your 100 pills and you're in the car with Sherman.  Describe to us please what then happens, where you are going and do you know to go there?

A:  Well, as we were pulling out my driveway I give him the hundred pills because he's doing the deal with this guy that we're going to meet and I'm taking the route he tells me.  He tells me what gas station to go to, so I knew which way to go.

*  *  *

Q:  What happens next?

A:  I pull up to the gas pump.  I stop.  This guy gets in the back seat of my car on the passenger side in the back.  When he gets in, Sherman introduces us and they begin to do the deal.  I'm sitting there.  I needed gas anyway so that's why I pulled up by the pump.  I reached down and was opening my gas lever.  That's when I seen the detectives coming.

Courtney further stated that before he left the house, he placed 100 ecstasy pills in a plastic bag. He gave the bag to defendant once they were inside the Honda.

{¶ 27} Cook confirms that when the Honda left Courtney's house, the car went directly to the gas station. There is no conflicting evidence on this point. After Courtney and defendant were arrested, the ecstasy pills and the marked money were retrieved from the informant.

{¶ 28} There is no evidence refuting Courtney's account that defendant set up the drug deal with the informant, contacted Courtney, and then took possession of the plastic bag when Courtney handed it to him as they entered Courtney's vehicle. Defendant had possession of the drugs as well as control over when they would be given to the informant. The evidence establishes that while defendant was inside Courtney's car, he had possession of the drugs.

{¶ 29} From the testimony of Courtney, Mendolera, and Cook, this court cannot conclude that the jury lost its way or that defendant's conviction for possession is against the manifest weight of the evidence. Defendant's second assignment of error is without merit.

III. The postrelease control term must be vacated because it was not imposed at sentencing.

{¶ 30} Defendant argues that the trial court erred by not informing him at his sentencing hearing that he would be subject to mandatory postrelease control pursuant to R.C. 2929.19(B)(3).[10] He further argues that the court's subsequent journalization of an order imposing postrelease sanctions was error. We agree.

{¶ 31} As recently stated by the Ohio Supreme Court in *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864:

[A] trial court has a statutory duty to provide notice of postrelease control at the sentencing hearing, [and] any sentence imposed without such notification is

---

10.   {¶ a} R.C. 2929.19(B)(3) states:

{¶ b} Subject to division (B)(4) of this section, if the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

{¶ c} * * *

{¶ d} (c) Notify the offender that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for a felony of the first degree or second degree, for a felony sex offense, or for a felony of the third degree in the commission of which the offender caused or threatened to cause physical harm to a person;

{¶ e} (d) Notify the offender that the offender may be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for a felony of the third, fourth or fifth degree that is not subject to division (B)(3)(c) of this section.

contrary to law. As a general rule, if an appellate court determines that a sentence is clearly and convincingly contrary to law, it may remand for resentencing. See R.C. 2953.08(G)(2). Furthermore, where a sentence is void because it does not contain a statutorily mandated term, the proper remedy is, likewise, to resentence the defendant.

Id. ¶ 23.

{¶ 32} In the case at bar, the state concedes that the trial court erred by failing to inform defendant at his sentencing hearing about postrelease control. Accordingly, defendant's third assignment of error is sustained, and this matter is remanded for resentencing in accordance with *Jordan,* supra.

Judgment accordingly.

GALLAGHER and CALABRESE, JJ., concur.